In the Matter of J. N. S.,
a Youth.

STATE OF OREGON,
*Petitioner-Respondent,*

*v.*

J. N. S.,
*Appellant.*

Yamhill County Circuit Court
00406528;
Petition Number J13282;
A147805

308 P3d 1112

Christa Obold-Eshleman argued the cause and filed the briefs for appellant.

Shannon T. Reel, Assistant Attorney General, argued the cause for respondent. With her on the briefs were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

Youth appeals the juvenile court's delinquency judgment. For the reasons explained below, we conclude that the state failed to present sufficient evidence to support a conclusion that youth engaged in conduct that, if committed by an adult, would constitute burglary in the second degree, ORS 164.215, and that the juvenile court did not correctly apply the definition of destructive device in analyzing whether youth engaged in conduct that, if committed by an adult, would constitute unlawful possession of a destructive device, ORS 166.382, and unlawful manufacture of a destructive device, ORS 166.384. Therefore, we (1) reverse the judgment finding youth within the jurisdiction of the court for second-degree burglary and remand for entry of a judgment finding youth within the jurisdiction of the court for second-degree criminal trespass and for resentencing, (2) reverse and remand for a new trial on the allegations of unlawful possession of a destructive device and unlawful manufacture of a destructive device, and (3) otherwise affirm.

We review the juvenile court's legal conclusions for errors of law, and we are bound by the court's findings of fact so long as there is evidence in the record to support them. *State v. S. T. S.*, 236 Or App 646, 655, 238 P3d 53 (2010). If the court did not make findings on disputed issues of fact, and there is evidence to support more than one factual conclusion, we presume that the court decided the facts in a manner consistent with the court's ultimate conclusion. *State v. G. L. D.*, 253 Or App 416, 418-19, 290 P3d 852 (2012).

We begin with the relevant facts. Youth and a companion entered a vacant house after throwing a rock through a back-door window and unlocking the door. Once inside, they took a key. Officers arrived at the house in response to a report of a break-in and detained youth and his companion as they were leaving the house. Youth told one of the officers that he thought the house "would be a cool place to hang out" and that "it was okay since no one lived there and no one owned it." Officers searched youth's bag and found a modified tennis ball and a magnesium fire starter, among other items. The tennis ball was filled with smokeless gunpowder

and had an improvised fuse made from a "Pixie Stick" wrapper and black tape. Youth told the officer that he had "cut [the tennis ball] open, filled it with gunpowder and taped up the hole and the fuse" in his bedroom and "was going to set it off later outside."

The state filed a delinquency petition alleging that youth had engaged in conduct that, if committed by an adult, would constitute burglary in the second degree (Count 1), ORS 164.215, unlawful possession of a destructive device (Count 2), ORS 166.382, unlawful manufacture of a destructive device (Count 3), ORS 166.384, criminal mischief in the third degree (Count 4), ORS 164.345, and theft in the third degree (Count 5), ORS 164.043.

During the delinquency hearing, the state called, among other witnesses, an Oregon State Police detective who worked in the agency's arson and explosives units. The detective testified that, if lit, the Pixie Stick fuse would burn until it ignited the smokeless gunpowder inside the tennis ball, which would create "an incendiary and over-pressure effect." The detective explained that, in an over-pressure situation, "the gases build up within the container to the point where the container would breach." In the case of the tennis ball device, that would create a "fireball" of about one to one and one-half feet. Although the tennis ball device would have created a visual and audible effect, the detective did not believe that it was a "pyrotechnic" device. The detective acknowledged that the explosion of the tennis ball device would have been on the "very low end of the scale," relative to what he would expect for a bomb, but opined that pieces of the rubber shell could inflict serious cuts or burns on a person within a six- to eight-foot radius of the device.

After the state presented its case, youth moved to dismiss the burglary count on the ground that the state had failed to prove that he entered the house with the intent to commit a crime therein. The court denied the motion, explaining its view that a person may be convicted of burglary if the person enters a building unlawfully, even if the person does not have the intent to commit a crime in the building at the time of his or her entry:

"I believe the cases have recently come out, and have stated for some time, that they commit a burglary anytime while they're in the premises they form the intent to commit a crime, that constitutes burglary. They don't have to have that particular intent at the time they enter[.]"

Youth also moved to dismiss the counts for unlawful possession of a destructive device and unlawful manufacture of a destructive device count on the ground that the state had failed to prove that the tennis ball device was a "destructive device" as defined by ORS 166.382. The court denied the motion, stating that, although it believed that youth was not "intending to create something that was going to be of particular damage to somebody else," the statutes prohibiting the possession and manufacture of destructive devices were intended to apply to "these kinds of devices * * *."

Youth then took the stand. Regarding the alleged burglary, he testified that he entered the vacant house because he thought that "it'd just be a cool place to hang out." He was acquainted with the former occupants of the house and had been inside the house when they had lived there. Youth believed that no one owned the house; he thought that it was "just an abandoned building." In response to questioning from defense counsel, youth testified that the house was "totally empty," and that, when he first entered the house, he was unaware of the existence of the key that his companion found inside.

Regarding the alleged possession and manufacture of a destructive device, youth testified that he had not decided whether he would light the tennis ball device, but if he did light it, he would have done so in an open space, "like a basketball court or tennis court," where there are "not usually very many people around." Youth stated that his purpose in making the tennis ball device was to show it to his companion and to create a "visual display," "[l]ike a bright flash." He intended the device to be "something that would be cool to look at."

At the close of the evidence, the court first found youth within the jurisdiction of the court for committing acts

that, if committed by an adult, would constitute second-degree burglary. The court stated, "[I]t's the entry or remaining in a building with the intent to commit a crime of some kind or nature, either going into it or while you're remaining in there." The court then found youth within its jurisdiction for unlawful possession of a destructive device and unlawful manufacture of a destructive device, merging the two counts. The court reasoned that the tennis ball device was "either an explosive or incendiary device, or a component," and remarked, "[Youth] did say that it was a pyrotechnic, which is an incendiary device." Thus, it appears that the court believed that pyrotechnic devices are destructive devices. The court also found youth within its jurisdiction for criminal mischief in the third degree for breaking the back-door window and theft in the third degree for taking the key. After the court delivered its ruling, it told youth, "I don't think you had that intent to hurt somebody else, but you did a foolish thing."

On appeal, youth advances three assignments of error.[1] Youth's first assignment of error is directed at the burglary count. Youth argues that the juvenile court erred in concluding that youth's intent to steal the key, formed *after* youth unlawfully entered the vacant house, was sufficient to establish the specific intent element of burglary.

Youth's second assignment of error is directed at the counts alleging unlawful possession and manufacture of a destructive device. Youth argues that the court erred in failing to hold that the tennis ball device fell within the exclusion for "pyrotechnic" devices in ORS 166.382(2)(a).

Youth's third assignment of error is directed at the third-degree theft count. He argues that the court erred in adjudicating youth delinquent for theft in the third degree because the state failed to prove that the key had any value. We reject that assignment of error without discussion.

We begin with youth's first assignment of error. Youth argues that the state's evidence was insufficient to

---

[1] Youth does not appeal the juvenile court's conclusion that he engaged in conduct that, if committed by an adult, would constitute criminal mischief in the third degree, ORS 164.345.

establish that he committed burglary in the second degree because, although the evidence established that he entered the house unlawfully, it did not establish that he entered the house with the intent to commit a crime therein. Instead, according to youth, the state's evidence established, at most, that he formed the intent to commit a crime—theft of the key—only after he entered the house. In response, the state argues that its evidence was sufficient because it established that youth formed the intent to steal the key while he unlawfully remained inside the house. In the state's view, a person commits second-degree burglary if the person enters a building unlawfully and, once inside, forms the intent to commit a crime therein.

With the issue thus framed, we turn to the burglary statutes. When interpreting a statute, we begin by examining the text of the statute in context and, if appropriate, the statute's legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009); *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993).

ORS 164.215, which defines the crime of burglary in the second degree, provides, in pertinent part: "[A] person commits the crime of burglary in the second degree if the person *enters or remains unlawfully* in a building with intent to commit a crime therein." (Emphasis added.) As relevant here, ORS 164.205(3)(a) - (b) define "enter or remain unlawfully" as "[t]o enter or remain in or upon premises when the premises, at the time of such entry or remaining, are not open to the public or when the entrant is not otherwise licensed or privileged to do so" or "[t]o fail to leave premises that are open to the public after being lawfully directed to do so by the person in charge[.]"

A person enters premises unlawfully when the person goes onto or into the premises without authorization. *State v. White*, 341 Or 624, 639-40, 147 P3d 313 (2006). A person remains unlawfully when, after entering with authorization, the person fails to leave after that authorization expires or is revoked. *Id.*

In *White*, 341 Or at 627, the state charged the defendant with two counts of burglary, alleging that the defendant

(1) "did unlawfully and knowingly enter and remain" with the intent to *assault* and (2) "did unlawfully and knowingly enter and remain" with the intent to *menace*; both offenses arose from a single unlawful entry and were directed at a single victim. The defendant was convicted of both counts and appealed, arguing that the court erred in denying his motion to merge the two counts into a single conviction.

The Supreme Court held that the trial court erred in entering two convictions, rejecting the state's argument that the law permits multiple burglary convictions based on a single unlawful entry. The court explained that "enters or remains unlawfully" has two plausible interpretations:

> "On the one hand, the legislature could have intended to present alternative methods of committing a single crime (burglary)—by entering unlawfully or by remaining unlawfully after an initial lawful entry. On the other hand, the legislature could have intended to define two separate crimes—entering unlawfully and remaining unlawfully."

*Id.* at 639.

The court held that the following statement from the legislative commentary to the burglary statutes resolved the question:

> "'As applied to the burglary sections, the concept of one committing the crime by 'remaining unlawfully' represents a departure from the traditional notion that burglary requires a 'breaking and entering' or an 'unlawful entry.' * * * Under the proposed definition *an initial lawful entry followed by an unlawful remaining* would constitute burglary if accompanied by an intent to commit a crime.'"

*Id.* (quoting Commentary to the Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 135 (July 1970) (emphasis in *White*)).

Based on that legislative history, the court adopted the first interpretation, concluding that

> "the legislature included the 'remains unlawfully' wording in the burglary statute solely to clarify that burglary could occur by remaining unlawfully *after an initial lawful entry.* It did not intend to provide that a defendant who commits burglary by entering a building unlawfully commits an

additional, separate violation of the burglary statute by remaining in the dwelling thereafter."

*Id.* (emphasis in original).[2]

Pursuant to *White*, we hold that second-degree burglary may be committed in two alternative ways: (1) entering a building unlawfully with the intent to commit a crime therein; or (2) entering a building lawfully, but then remaining unlawfully—*viz.*, failing to leave after authorization to be present expires or is revoked—with the intent to commit a crime therein.[3] In either case, burglary requires criminal trespass *for the purpose of committing a*

---

[2] This court reached the same conclusion in *State v. Lucio-Camargo*, 172 Or App 298, 301, 18 P3d 467 (2001), *rev allowed, judgment vac'd*, 334 Or 491, 52 P3d 1056 (2002), a merger case that also involved a defendant charged with two counts of burglary—(1) entering unlawfully with the intent to *assault* and (2) remaining unlawfully with the intent to *menace*. We observed that, in the 1971 revisions to the Oregon Criminal Code, Or Laws 1971, ch 742, §§ 135-36, the legislature replaced "breaking and entering," ORS 164.215 (1969), with "enters or remains unlawfully," borrowing the phrase from the New York Revised Penal Law § 140.00. *Id.* at 306. Donald Paillette, the project director of the Criminal Law Revision Commission, testified that "remains unlawfully" was added to enable administrators of public buildings to remove people who entered lawfully but remained unlawfully; the intent was "not to get at the burglaries, but to get at the trespass." *Id.* In the context of burglary, he explained that "a lawful entry *** could become burglary because it became an unlawful remaining that coincided with the intent to commit some crime in that building." *Id.* at 307. Given the legislature's focus on the invasion of the possessory interests of property owners, we concluded that "enters unlawfully" and "remains unlawfully" address discrete concerns; thus, "enters or remains unlawfully" is a single statutory provision that can be violated in two alternative ways.

[3] We note that our holding is consistent with the rule in some other jurisdictions. For example, in *People v. Gaines*, 74 NY2d 358, 361, 546 NE2d 913 (1989), the New York Court of Appeals observed that, although the New York third-degree burglary statute could be read to support the contention that "remains unlawfully" abrogates the requirement of criminal intent at the time of unlawful entry, that interpretation is "not consistent with the purpose of classifying burglary as a separate and relatively more serious crime" than trespass. The court concluded that the legislature was addressing a particular factual situation—"not one of unlawful entry but of unauthorized remaining in a building after lawful entry":

"By the words 'remains unlawfully' the Legislature sought to broaden the definition of criminal trespass, not to eliminate the requirement that the act constituting criminal trespass be accompanied by contemporaneous intent to commit a crime.

"In order to be guilty of burglary for unlawful remaining, a defendant must have entered legally, but remain for the purpose of committing a crime after authorization to be on the premises terminates. And in order to be guilty of burglary for unlawful entry, a defendant must have had the intent to commit a crime at the time of entry."

*Id.* at 362-63.

*crime.* Thus, the proper focus is on the defendant's intent at the initiation of the trespass. If the trespass begins when a defendant *enters a building,* then we ask whether the defendant possessed the requisite criminal intent at the time of the unlawful *entry.* If the trespass begins when a defendant *remains in a building* after authorization has expired or has been revoked, then we ask whether the defendant possessed the requisite criminal intent at the time of the unlawful *remaining.*[4]

Our construction of the statute is consistent with the legislative purpose underlying the crime of burglary, which is to punish trespass for the purpose of committing a crime. As we observed in *State v. Chatelain,* 220 Or App 487, 492, 188 P3d 325 (2008), *aff'd,* 347 Or 278, 220 P3d 41 (2009), "[a] defendant's intent to commit a crime *at the time* of an unlawful entry is central to the crime of burglary. Without it a defendant's conduct cannot constitute burglary of any degree; that intent is, in fact, the essence of the offense." (Emphasis added.) We also observed that, while the

> "'basic rationale of the sections on criminal trespass is the protection of one's property from unauthorized intrusion by others,' the injury or harm associated with burglary goes beyond that and includes the protection of one's property against the threat of intrusion *for the purpose of committing a crime*[.]"

*Id.* at 493 (quoting Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report, §§ 136, 140 (July 1970)) (emphasis in original; internal citations omitted); *see also Chatelain,* 347 Or at 286 ("Since the time of Blackstone, the defendant's intent to commit a crime in the building has been the characteristic distinguishing burglary from mere trespass.").

The state relies on *State v. Felt,* 108 Or App 730, 816 P2d 1213 (1991), *rev den,* 313 Or 75 (1992), and *State v. Papineau,* 53 Or App 33, 630 P2d 904, *rev den,* 291 Or 662

---

[4] If we were to hold otherwise, the meaning of "remains unlawfully" would depend on the manner of entry. In the case of a *lawful* entry, "remains unlawfully" would mean the initial act of trespass, *i.e.,* the moment a person decides to stay without authorization; in the case of an *unlawful* entry, "remains unlawfully" would mean the continuation of a trespass.

(1981), for the proposition that a person may commit second-degree burglary by entering a premises and then forming the intent to commit a crime therein. In *Felt*, 108 Or App at 732-33, the defendant *lawfully* entered the victim's home, but, after the victim withdrew her consent to his presence, he "remain[ed] unlawfully" and assaulted her. Thus, *Felt* represents the precise scenario that the "remains unlawfully" provision was intended to address: a *lawful* entry into a building followed by a revocation of authorization, resulting in an *unlawful* remaining with the intent to commit a crime therein. *Felt* is therefore consistent with *White* and inapplicable here. *Papineau* is distinguishable from the present case because, in *Papineau*, the defendant possessed *some* criminal intent *at the time* of the unlawful entry. Moreover, to the extent that *Papineau* can be read to suggest that a person can be convicted of burglary for unlawfully entering a building and thereafter forming intent to commit a crime therein, it is inconsistent with *White*.

Here, the parties do not dispute that youth entered the vacant house unlawfully; thus, the critical inquiry is whether the court erred in denying youth's motion to dismiss on the ground that youth lacked the requisite criminal intent at the time of the entry. When reviewing the denial of a motion to dismiss in juvenile court, we examine the facts in the light most favorable to the state to determine "whether a rational trier of fact, drawing reasonable inferences, could have found that the state proved the elements of the charged offense beyond a reasonable doubt." *See State v. Neff*, 246 Or App 186, 188, 265 P3d 62 (2011) (citing *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994)).

The state's theory of burglary was that youth entered the house with the intent to commit theft therein.[5] Youth testified that he did not form the intent to steal the key until he was already inside the house, and the trial court commented favorably on youth's credibility. But even if the trial court had disbelieved youth's testimony regarding his

---

[5] In the delinquency petition, the state alleged that youth "enter[ed] and remain[ed] in a building *** with the intent to commit the crime[s] of Criminal Mischief and Theft therein[.]" However, both in the juvenile court and on appeal, the state argued only that the defendant had the intent to commit theft. Accordingly, we address only that argument.

intent, the only evidence that the state offered to show that youth had the intent to commit a crime inside the house at the time he entered the house was youth's possession of the key. Thus, to conclude that youth possessed the requisite criminal intent, the court would have to infer that, because youth possessed a key from inside the house, he had formed the intent to commit theft inside the house when he unlawfully entered. That inference is impermissibly speculative. *Cf., e.g., State v. Moreno,* 197 Or App 59, 64, 104 P3d 628 (2005) (defendant's theft of five packages of Sudafed was insufficient to support an inference that defendant intended to manufacturer methamphetamine). Viewing the evidence in the light most favorable to the state, we conclude that no rational trier of fact, drawing reasonable inferences, could find that youth entered the house with the intent to commit theft therein.

Although the court erred in adjudicating youth delinquent for burglary in the second degree, the court's factual findings are sufficient to support an adjudication for criminal trespass in the second degree, ORS 164.245. The juvenile court found that youth entered the vacant house without authorization, and there is evidence in the record to support that finding. Because second-degree criminal trespass is a lesser-included offense of second-degree burglary, *Chatelain,* 347 Or at 282, we reverse and remand for entry of a judgment finding youth within the jurisdiction of the court for committing acts that, if committed by an adult, would constitute second-degree criminal trespass. *See Chatelain,* 220 Or App at 495-96 (reversing conviction for second-degree burglary and remanding for entry of conviction for second-degree criminal trespass and for resentencing).

We turn to youth's second assignment of error. Youth argues that the trial court misunderstood the statutory definition of "destructive device" and, as a result, erroneously concluded that the tennis ball device was a destructive device, when, youth argues, it was a "pyrotechnic" device, and, thus, under ORS 116.382(2)(a), was excluded from the definition of "destructive device." In response, the state argues that the tennis ball device was a destructive device because it was a "bomb" under ORS 166.382(1)(a)(A), and that it was not a "pyrotechnic" device under ORS 166.382(2)(a)

because it did not serve "a functional or an emergency purpose."

We begin with the statutes that prohibit the possession and manufacture of destructive devices. ORS 166.382 defines the crime of unlawful possession of a destructive device and also defines the term "destructive device." It provides, in pertinent part:

"(1)   A person commits the crime of unlawful possession of a destructive device if the person possesses:

"(a)   Any of the following devices with an explosive, incendiary or poison gas component:

"(A)   Bomb;

"(B)   Grenade;

"(C)   Rocket having a propellant charge of more than four ounces;

"(D)   Missile having an explosive or incendiary charge of more than one-quarter ounce; or

"(E)   Mine; or

"(b)   Any combination of parts either designed or intended for use in converting any device into any destructive device described in paragraph (a) of this subsection and from which a destructive device may be readily assembled.

"(2)   As used in this section:

"(a)   *'Destructive device' does not include any device which is designed primarily or redesigned primarily for use as a signaling, pyrotechnic, line throwing, safety or similar device.*"

(Emphasis added.)

ORS 166.384 defines the crime of unlawful manufacture of a destructive device:

"(1)   A person commits the crime of unlawful manufacture of a destructive device if the person assembles, produces or otherwise manufactures:

"(a)   A destructive device, as defined in ORS 166.382; or

"(b) A pyrotechnic device containing two or more grains of pyrotechnic charge in violation of chapter 10, Title 18 of the United States Code."[6]

Thus, as relevant here, "destructive device[s]" include "bomb[s]" that have "an explosive or incendiary" component, but do not include "any device which is designed primarily or redesigned primarily for use as a * * * pyrotechnic * * * device." Therefore, even if a device is a "bomb" with an "explosive or incendiary" component—as the state argues the tennis ball device is—it is not a "destructive device" if it is "designed primarily" for use as a "pyrotechnic" device.

Whether youth's tennis ball device falls within the exclusion for "pyrotechnic" devices requires us to determine the meaning of "pyrotechnic." This court has explained that, although "pyrotechnic" is not defined by statute, it refers to what are commonly known as "fireworks." *State ex rel Juv. Dept. v. Garrett*, 193 Or App 629, 631, 91 P3d 830 (2004) (citing *Webster's Third New Int'l Dictionary* 1854 (unabridged ed 1993)). Fireworks are "combustible or explosive substances, including 'bombs,' that are 'prepared for the purpose of providing a visible or audible effect.'" *Id.* at 631 (quoting *former* ORS 480.110(1) (1951), *repealed by* Or Laws 2013, ch 24, § 13).

The critical inquiry thus becomes whether the tennis ball device was "designed primarily * * * for use" in "providing a visible or audible effect." We therefore turn to the meaning of "designed primarily." Youth argues that, because the plain meaning of "design" places emphasis on the designer's intent, we must look to youth's subjective intent in designing the device, rather than the device's potential uses.

We typically give words of common usage their "plain, natural, and ordinary meaning." *PGE*, 317 Or at 611. As relevant here, the verb "design" means "to conceive and plan out in the mind," "to devise or propose for a specific

_____

[6] We need not address whether youth violated ORS 166.384(1)(b), because the state proceeded under the theory that the device that youth manufactured violated ORS 166.384(1)(a).

function," "to create, plan, or calculate for serving a predetermined end," and "to create, fashion, execute, or construct according to plan." *Webster's Third New Int'l Dictionary* 611 (unabridged ed 2002). When "design" is used in the passive or participial form, as it is in ORS 116.382(2)(a), it means "to plan or produce with special intentional adaptation to a specific end." *Id.; see also Papas v. OLCC*, 213 Or App 369, 378, 161 P3d 948 (2007).[7] "Designed" is modified by "primarily," which means "first of all: fundamentally, principally." *Webster's* at 1800. That suggests that the focus of the analysis is the principal purpose of the design, not merely any potential purpose.

Accordingly, for a device to be "designed primarily * * * for use" as a "pyrotechnic" device, the designer must subjectively intend or plan that the device will be employed principally for the purpose of providing a visible or audible effect. In determining whether a device was designed primarily for use as a pyrotechnic, a factfinder may consider not only direct evidence of the designer's intent, but also objective characteristics of the device that allow the factfinder to make reasonable inferences regarding the designer's intent.

While operating under the misapprehension that "pyrotechnic" devices are "destructive devices," the juvenile court found that the tennis ball device was a "destructive device." Consequently, the court did not address whether the tennis ball device fell under the statutory exclusion for "pyrotechnic" devices. Because "factual issues pertinent to a material element of the crime remain unresolved, 'the proper disposition is to reverse and remand for a new trial[.]'" *State v. Barboe*, 253 Or App 367, 378, 290 P3d 833 (2012), *rev den*, 353 Or 714 (2013) (quoting *State v. Schodrow*, 187 Or App 224, 232, 66 P3d 547 (2003) (brackets in *Barboe*)). Thus, we reverse the judgment finding youth within the jurisdiction

---

[7] In *Papas*, 213 Or App at 378, reviewing the Oregon Liquor Control Commission's interpretation of a rule prohibiting "high volume drinking practices," we concluded that the plain meaning of "designed" indicated that "a drinking contest is '*designed* to increase consumption * * * in increased quantities' only if that characteristic is the *intended purpose* of the person devising the contest, not merely a possible or even probable result of the contest's rules." (Emphases added; omission in original.)

of the court for unlawful possession of a destructive device (Count 2) and unlawful manufacture of a destructive device (Count 3),[8] and we remand for a new adjudication on those counts.

With respect to burglary in the second degree, reversed and remanded for entry of judgment finding youth within the jurisdiction of the court for second-degree criminal trespass and for resentencing; with respect to unlawful possession and manufacture of a destructive device, reversed and remanded for a new adjudication; otherwise affirmed.

---

[8] As mentioned, the juvenile court merged Count 2 into Count 3.